**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DR. DEBORAH PARISH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:16-cv-00006 |
| | ) |
| UPMC UNIVERSITY HEALTH CENTER | ) |
| OF PITTBURGH, DR. EVAN L. WAXMAN, | ) |
| DR. SUSAN STEFKO and DR. JOEL S. | ) |
| SCHUMAN, | ) |
| | ) |
| Defendants. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

This Title VII employment discrimination case arises out Plaintiff Deborah Parish's ("Plaintiff") tenure as an ophthalmology resident with Defendant UPMC University Health Center of Pittsburgh ("UPMC"). Pending before the Court is a Motion for Summary Judgment filed by Defendants UPMC, Dr. Evan L. Waxman ("Dr. Waxman"), Dr. Susan Stefko ("Dr. Stefko") and Dr. Joel S. Schuman ("Dr. Schuman") (collectively, "Defendants"). (Mot. for Summ. J., ECF No. 136.) For the reasons that follow, Defendants' Motion for Summary Judgment will be granted.

1

# I.     RELEVANT FACTS[1]

Plaintiff's operative Fourth Amended Complaint[2] asserts multiple claims under various employment anti-discrimination statutes.[3] Count I asserts a claim of pregnancy discrimination against UPMC under Title VII,[4] the Pregnancy Discrimination Act,[5] and the Pennsylvania Human Relations Act (PHRA).[6] Count II asserts a claim of gender discrimination against UPMC under Title VII and PHRA. Count IV asserts a claim for retaliation against UPMC under Title VII. Count V asserts a claim for aiding and abetting discrimination against Dr. Waxman, Dr. Stefko and Dr. Schuman (the "Individual Defendants") under the PHRA. Finally, Count VI asserts a claim for retaliation against UPMC under the PHRA.

As explained in detail below, Plaintiff entered UPMC's Ophthalmology Residency Program ("Residency Program") as a first-year resident in July 2013. She gave birth to her first child in the beginning of her second year of residency. Half-way through her second year, Plaintiff was placed on probation. At the end of her second year, she was required to repeat multiple rotations. Shortly thereafter, Plaintiff's participation in the Residency Program was terminated Plaintiff argues that she was subjected to adverse employment actions based on her pregnancy, but

---

[1] The factual background is composed of the undisputed evidence in the record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[2] (4th Am. Compl., ECF No. 64.)

[3] Pursuant to a footnote in her brief in opposition and as confirmed by the Court at Oral Argument, Plaintiff does not object to the dismissal of Counts III, IV (to the extent it asserts claims under the Americans with Disabilities Act, the Rehabilitation Act, and the FMLA), and VII. Those Counts will be dismissed with prejudice. (*See* ECF No. 161, n.1.)

[4] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

[5] 42 U.S.C. § 1981.

[6] 43 P.S. § 951 *et seq.*

2

Defendants argue that all of the actions taken against Plaintiff were based on her unsatisfactory performance in the Residency Program.

## A. The Residency Program

UPMC's Residency Program is a three-year clinical training program in which residents rotate through the various "services" within the Ophthalmology Department under the supervision of faculty and attending physicians.[7] The service rotations include:

- Comprehensive Eye Service ("CES")
- Consults
- Cornea
- Glaucoma
- Neuro-Ophthalmology Service
- Oculoplastics ("Plastics")
- Pediatric Ophthalmology ("Peds")
- Retina and Veterans Administration Hospital Service ("VA").[8]

In addition to being part of a clinic team on rotations, residents also are expected to be "on call," which involves them interacting with patients and working more independently as they advance.[9]

In 2013, UPMC materially changed its Residency Program's evaluation process from one in which many faculty members meet to evaluate the residents to one in which a smaller Clinical Competency Committee ("CCC") meets on a semi-annual basis to review and evaluate the

---

[7] (Defs.' Concise Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 2, ECF No. 142; Pl.'s Resp. to Defs.' Concise Statement of Undisputed Material Facts and Counter Statement of Material Facts ("Pl.'s CSMF") ¶ 2, ECF No. 162.)

[8] (Defs.' SMF ¶ 4; Pl.'s CSMF ¶ 4.)

[9] (Defs.' SMF ¶ 5; Pl.'s CSMF ¶ 5.)

3

residents.[10] Residents are provided with daily feedback from various faculty, staff, patients and peers as they work with patients, and they are expected to demonstrate increasing levels of proficiency in various "competencies" as they progress through the Program.[11] Those competencies include: (1) patient care and procedural skills, (2) medical knowledge, (3) practice-based learning and improvement, (4) interpersonal and communication skills, (5) professionalism, and (6) systems-based practice. At the end of each rotation, faculty members that interacted with the resident on that rotation complete a "Milestone Evaluation," in which they rate the resident from 1 to 5 for each competency.[12] The CCC then considers those Milestone Evaluations along with other factors (incident reports, commendations, standardized exam scores, peer and staff evaluations, patient evaluations, and grand-rounds performance) to reach a "360-review" that is shared with the resident through a letter.[13] Consistent with the goal of training residents to practice in all aspects of ophthalmology, good performance in one or two subspecialties of ophthalmology does not negate serious deficiencies in other areas, since the assessment is a holistic one as to the resident's fitness to proceed as an ophthalmologist.[14] During Plaintiff's time as a resident, Drs.

---

[10] (Defs.' SMF ¶¶ 7, 11, 16–17; Pl.'s CSMF ¶¶ 7, 11, 16–17.)

[11] (Defs.' SMF ¶¶ 6–7; Pl.'s CSMF ¶¶ 6–7.)

[12] (Defs.' SMF ¶¶ 18, 19; Pl.'s CSMF ¶¶ 18, 19.)

[13] (Defs.' SMF ¶¶ 13, 22; Pl.'s CSMF ¶¶ 13, 22.)

[14] (Defs.' SMF ¶ 26; Pl.'s CSMF ¶ 26.)

4

Waxman and Stefko were members of the CCC, and Dr. Schuman was the Chairman of the Department of Ophthalmology at University of Pittsburgh Physicians.[15]

The CCC decides whether a resident will be promoted to the next year of residency.[16] A resident need not receive at least a "Level 4" in all milestones or secure a certain standardized test score in order to graduate from the Program.[17] Similarly, there is no finite number of mistakes that a resident is allowed (or not) before they are terminated from participation. Finally, under UPMC's Resident/Fellow Termination Policy, a resident may be terminated from participation for a number of reasons, including unsatisfactory performance and endangering patient safety.[18]

## B. Plaintiff's Tenure in the Residency Program

Before the Court summarizes Plaintiff's performance and experience in the Residency Program, one point must be addressed. The parties, on both sides of the caption, appear to "cherry-pick" quotes from depositions and various performance evaluations in the record, with Plaintiff largely ignoring undisputed evidence of negative feedback and Defendants largely ignoring similar evidence of positive feedback. The Court, therefore, provides this factual section based on the *facts* construed in the light most favorable to the Plaintiff, not any party's selective and tilted interpretations of the facts. In the most glaring example, in Plaintiff's CSMF, she averages together Milestone Ratings in an effort to prove that Plaintiff was "at level" for the rotation as a whole, but the record is clear and undisputed that when those Milestone Evaluations are reviewed by the CCC, they are not so averaged. (*See, e.g.*, Pl.'s CSMF ¶ 267; Defs.' SMF ¶ 20; Pl.'s CSMF ¶¶ 20, 267.)

---

[15] (Defs.' SMF ¶ 10; Pl.'s CSMF ¶ 10.)

[16] (Defs.' SMF ¶ 24; Pl.'s CSMF ¶ 24.)

[17] (Pl.'s CSMF ¶¶ 233–34; Defs.' Responses and Counterstatements to Pl.'s CSMF ("Reply SMF") ¶¶ 233–34, ECF No. 170.)

[18] (Defs.' SMF ¶ 30; Pl.'s CSMF ¶ 30.)

5

To accept Plaintiff's system of "averaging" would enable Plaintiff to reformulate the employer's standards in a manner that enables her to meet them, which is beyond the deference provided to Plaintiff as the non-moving party at this stage. *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998) ("plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied *the criterion identified by the employer* or that the employer did not actually rely upon the stated criterion") (emphasis added). With that, the Court turns to the record facts relevant here, viewed in the light most favorable to the Plaintiff.

### 1. First Year (Level PGY-2)

Plaintiff accepted employment with the Residency Program as a first-year resident, or PGY-2 level, for the period beginning July 1, 2013, through June 30, 2014.[19] In or around November 2013, Plaintiff made her pregnancy known to Dr. Waxman, Dr. Schuman, Dr. Martel, Dr. Stefko, and other doctors.[20]

After her first six months (i.e. the first review period), around January or February 2014, Plaintiff received her First PGY-2 Semi-Annual Review Letter ("First Review Letter") from the CCC.[21] Plaintiff objected to some of the content in this First Review Letter on the basis that it was worded differently than the rotation evaluations that she had received directly.[22] The parties dispute the extent to which the First Review Letter accurately reflected the previous six months of evaluations that Plaintiff received.[23] However, it is undisputed that "[s]ome problems were noted"

---

[19] (Defs.' SMF ¶¶ 32, 34; Pl.'s CSMF ¶¶ 32, 34.)

[20] (Defs.' SMF ¶¶ 35, 36; Pl.'s CSMF ¶¶ 35, 36.)

[21] (Pl.'s CSMF ¶ 254; Defs.' Reply SMF ¶ 254.)

[22] (Pl.'s CSMF ¶¶ 252–53.)

[23] (Pl.'s CSMF ¶ 253; Defs.' Reply SMF ¶ 253.)

in Plaintiff's early rotations.[24] The evaluation of Plaintiff's first rotation—Plastics—prior to Plaintiff's disclosure of her pregnancy noted concerns as to Plaintiff's "fund of knowledge," her decision-making and her willingness or ability to take responsibility for her own actions or medical knowledge.[25] However, Defendants acknowledged that a low score is typical for a resident's first rotation evaluation.[26] Some problems arose in other rotations, including misdiagnoses and difficulty with presenting, demonstrating medical knowledge, and clinical performance.[27] It is also undisputed that Plaintiff received some commendation during this first review period.[28] In fact, Plaintiff received "at" or "above level" ratings in Neuro-Ophthalmology, Cornea and Retina, as well as positive comments on those rotation evaluations.[29]

Ultimately, Dr. Schuman felt the language of the First Review Letter was harsher than necessary in light of the rotation evaluations and asked Dr. Waxman to decrease the harshness of the comments, concluding that the First Review Letter's conclusions were not supported by the rotation evaluations, including the rotational evaluation from Plaintiff's rotation with Dr. Waxman.[30] Dr. Waxman then issued a "Revised" First Review Letter.[31] It is undisputed that the Revised First Review Letter "was more consistent with the milestone documents that were

---

[24] (Pl. Br. in Opp'n, ECF No. 161, at 4.)

[25] (Defs.' SMF ¶¶ 113, 115, 117; Pl.'s CSMF ¶¶ 113, 115, 117). Plaintiff asserts that "[s]imilar or worse evaluations were given to male residents," but Plaintiff fails to provide record support for this statement. (Pl.'s CSMF ¶ 115.)

[26] (Pl.'s CSMF ¶ 242; Defs.' Reply SMF ¶ 242.)

[27] (Defs.' SMF ¶¶ 119–25; Pl.'s CSMF ¶¶ 119–25.)

[28] (Pl.'s CSMF ¶ 249; Defs.' Reply SMF ¶ 249.)

[29] (Pl.'s CSMF ¶¶ 244, 246, 247; Defs.' Reply SMF ¶¶ 244, 246, 247.)

[30] (Defs.' SMF ¶¶ 42–43; Pl.'s CSMF ¶¶ 42–43, 254; Defs.' Reply SMF ¶ 254.)

[31] (Waxman Dep. at 111:11–112:14.)

completed" during the review period and characterized Plaintiff's performance up to that point as "very good."[32] Plaintiff continued through her rotations during the second-half of her first year, i.e. the second review period of level PGY-2. The parties also dispute the quality of Plaintiff's performance during this time period, but both parties rely on the same record evidence to support their respective position: Dr. Waxman's deposition.[33] In the first rotation, Pediatrics, Plaintiff had milestone markers at Level 2.5, Level 1.5, and Level 3.5, which Dr. Waxman commented "appear[ed] to be at level" for her tenure in the Residency Program since a Level 2 is considered to be "at level" for a resident twelve months into the program and Plaintiff was only about six months into her tenure.[34] Although Dr. Waxman testified that he considered the Level 3.5, which was Plaintiff's competency rating for Professionalism during her Pediatrics rotation, to be a product of grade inflation, he also acknowledged that this review was the opinion of more than one doctor.[35] In Plaintiff's next rotation, CES, her milestone evaluation showed competency ratings between 1.5 and 2, which were on par with a resident of 6 to 12 months' tenure.[36] Plaintiff proceeded to the Consult Service rotation, where her milestone evaluation was below a Level 1 in every competency.[37] Plaintiff rotated through CES a second time in April and May 2014, and her rotation evaluation shows a majority of her competencies at a Level 2 and some at a Level 1.5, but Dr. Waxman, who drafted this particular rotational evaluation, testified that her evaluation was not

---

[32] (Pl.'s CSMF ¶¶ 259–60; Defs.' Reply SMF ¶¶ 259–60.)

[33] (Waxman Dep., Ex. B to Pl.'s App. to CSMF, ECF No. 163-1.)

[34] (Waxman Dep. at 115:19–116:9.)

[35] (*Id.* at 116:1–22.)

[36] (*Id.* at 120:18–121:8.)

[37] (*Id.* at 124:6–9.)

"at level" for a resident of her tenure in light of some comments in the evaluation that "her information gathering exam and presentation skills are still lagging," "she misses findings on ophthalmoscopic exam," "medical knowledge as demonstrated in the exam room at wrap-up will need some work," she "has a tendency to explain away any discrepancies pointed out to her in a teaching situation," but "[h]er refraction skills are excellent."[38] When asked why her rotation evaluation would reflect an "at level" rating and comments not to the contrary if, in reality, the faculty felt she was not "at level," Dr. Waxman could not provide an answer other than such criticism may be delivered through other undocumented mechanisms, such as one-on-one conversations.[39]

During this review period, about four months after announcing her pregnancy, Plaintiff received a score in the bottom 5th percentile of a standardized test, the OKAP (Ophthalmic Knowledge Assessment Program), "which is a national exam that mimics the format of a board certification exam and is suppose to be an objective measure of where a particular resident stands nationally with respect to ophthalmic knowledge."[40] Plaintiff also applied for and received a fellowship at Emory University, described as a "prestigious" fellowship by one faculty physician.[41] Her Emory fellowship application included a very favorable letter of recommendation by Dr. Schuman.[42] Around the same time, Plaintiff also presented a poster at the North American Neuro-Ophthalmology Society Convention, and one faculty physician commented that her presentation

---

[38] (*Id.* at 132:10–134:6.)

[39] (*Id.* at 138:12–143:18.)

[40] (Defs.' SMF ¶ 47; Pl.'s CSMF ¶ 47.)

[41] (Pl.'s CSMF ¶ 272; Defs.' Reply SMF ¶ 272.)

[42] (Pl.'s CSMF ¶ 273; Defs.' Reply SMF ¶ 273.)

was well received.[43] Plaintiff received additional positive feedback during the review period, including commendation by faculty physicians during Grand Rounds and a rating of "exceeded expectations" on an Ophthalmic Clinical Evaluation exercise.[44]

The CCC re-convened on June 3, 2014 to address Plaintiff's second review period.[45] It is undisputed that the members expressed concerns that Plaintiff could not perform unsupervised and she lacked examination skills and knowledge to safely see patients on her own.[46] "Dr. Waxman stated 'I want to be a little more quiet as we further discuss Deb as I don't want to prejudice you all.'"[47] The CCC also discussed that Plaintiff's OKAP scores were the lowest of the program.[48] In response to a question about whether Plaintiff would have to make up the time she had missed and would miss due to medical issues and her anticipated maternity leave, Dr. Waxman explained that due to Plaintiff's pregnancy, medical complications, and anticipated maternity leave, the second-year rotation schedule had to be configured around her leave, and that Plaintiff and her cardiologist

---

[43] (Pl.'s CSMF ¶¶ 274–75; Defs.' Reply SMF ¶¶ 274–75.)

[44] (Pl.'s CSMF ¶ 277; Defs.' Reply SMF ¶ 278.)

[45] Plaintiff seeks to include the minutes from this CCC meeting into the record, and Defendants object on the basis that the minutes constitute hearsay that would not be admissible at a trial. At the summary judgment stage, hearsay evidence may be considered so long as it could be presented in a form admissible at trial. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990). "The proponent need only explain the admissible form that is anticipated." *FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). Here, Plaintiff asserts the meeting minutes are admissible under Federal Rule of Evidence 803(6), the Records of a Regularly Conducted Activity exception. The Court agrees that the meeting minutes so qualify, and Defendants have failed to show either methods or circumstances of preparation that indicate a lack of trustworthiness. Fed. R. Evid. 803(6)(E).

[46] (Defs.' SMF ¶¶ 48–49; Pl.'s CSMF ¶¶ 48–49.)

[47] (ECF No. 163-1, at 129.)

[48] (*Id.* at 131.) Another resident that appeared to be more tenured than Plaintiff had an OKAP score in a lower percentile (but higher raw score, likely due to different tenure in the program), but had Level 4 in all other Milestones. (*Id.* at 124.) The CCC noted that this resident was at a Level 4 with respect to demonstrating his medical knowledge, but his poor performance on the OKAP warranted a Level 2 on Medical Knowledge. There was no discussion with respect to this resident of remediation efforts or questions about whether the resident should graduate. (*Id.*)

10

"have rigged things so that she's not actually taken medical leave."[49] Dr. Waxman expressed hesitancy at the idea of firing Plaintiff because it "would require a lot of work and a lot of pain and lawsuits. This will be the second adverse action against a pregnant woman in the last few years."[50] Dr. Waxman also acknowledged that a colleague had accused him of playing favorites and "being mean" to Plaintiff. The CCC voted on whether to promote plaintiff to second-year status, and Drs. Mitchell, Mammen, and Martel voted to promote.[51] Dr. Stefko voted to not promote, and Dr. Waxman abstained.[52]

Dr. Waxman then prepared the PGY-2 Second Semi-Annual Review Letter ("Second Review Letter") with the CCC's input.[53] The Second Review Letter provided that: the CCC had "serious concerns regarding [Plaintiff's] performance to date" and would need to see "substantial progress," particularly in the areas of patient care and medical knowledge; the CCC was concerned that Plaintiff was not ready to take on the increased autonomy and responsibilities associated with the second year of residency; the CCC believed that none of this was beyond Plaintiff's ability to achieve and, with appropriate attention to the concerns cited by the CCC, she would be able to move forward in the Residency Program; and the faculty was committed to assisting Plaintiff to improve.[54] In that regard, the PGY-2 Second Semi-Annual Review Letter explained that a subcommittee would be arranged to meet with Plaintiff, review her training records and generate

---

[49] (*Id.* at 131.) It is undisputed that during her pregnancy, Plaintiff received her requested accommodations. (Defs.' SMF ¶ 164; Pl.'s CSMF ¶ 164). Plaintiff argues that this accommodation was "done with some disdain by her supervisor, as was noted in the June 3, 2014, CCC Meeting Minutes." (Pl.'s CSMF ¶ 164.)

[50] (*Id.* at 131.)

[51] (*Id.* at 132.)

[52] (*Id.* at 132.)

[53] (Defs.' SMF ¶ 52; Pl.'s CSMF ¶ 52.)

[54] (Defs.' SMF ¶¶ 55, 59–60; Pl.'s CSMF ¶¶ 55, 59–60.)

11

a set of standards she must meet to stay on track for graduation in June 2016.[55] It was determined that Dr. Waxman and the other CCC members would closely monitor Plaintiff, which included bi-weekly phone calls with Dr. Waxman to discuss patient cases.[56]

In July 2014, Dr. Waxman met with Plaintiff and Dr. Lope, who was her selected faculty mentor, to discuss her performance for the PGY-2 Second Semi-Annual Review period.[57] Plaintiff requested that that the Second Review Letter be changed, but her request was denied.[58] In mid-July, Plaintiff approached Marlene Cooper, UPMC's Ombudsman with a copy of the June 3, 2014, CCC meeting minutes, expressing her belief that Dr. Waxman was discriminating against her.[59] Meanwhile, Plaintiff completed her last rotation of her first year in the Cornea Service, where she received a Level 1.5 for medical knowledge, with the comment: "Only weakness [Plaintiff] has is her fund of knowledge."[60] All other competencies were at a Level 2 or higher, with a general comment that Plaintiff "did a very nice job on her Cornea rotation."[61]

During Summer 2014, Plaintiff requested paid maternity leave in accordance with the UPMC FMLA policy at the time.[62] Her leave was approved in June 2014.[63]

---

[55] (Defs.' SMF ¶ 54; Pl.'s CSMF ¶ 54.)

[56] (Defs.' SMF ¶¶ 74, 75; Pl.'s CSMF ¶¶ 74, 75.)

[57] (Defs.' SMF ¶ 53; Pl.'s CSMF ¶ 53.)

[58] (Defs.' SMF ¶ 61; Pl.'s CSMF ¶ 61.)

[59] (Defs.' SMF ¶ 164; Pl.'s CSMF ¶ 164.)

[60] (ECF No. 163-1, at 210–11.)

[61] (*Id.* at 207–16.)

[62] (Defs.' SMF ¶¶ 166–67; Pl.'s CSMF ¶¶ 166–67.)

[63] (Defs.' SMF ¶¶ 166–67; Pl.'s CSMF ¶¶ 166–67.)

### *2. Second Year (PGY-3)*

Plaintiff signed a contract for a new appointment term from July 2014 to June 2015 at the PGY-3 level.[64] In July 2014, Dr. Waxman and Dr. Schuman proposed a tentative leave plan that would require any resident to use two (2) weeks of vacation time if the resident elected to take six (6) weeks of medical or maternity leave.[65] Plaintiff gave birth on August 4, 2014.[66] Four days later, on August 8, 2014, Dr. Waxman e-mailed the residents eliciting feedback on a draft leave policy that also proposed a reduction in the maternity leave policy.[67] Neither proposed change in the leave policy was ever adopted, and Plaintiff received six (6) weeks of paid leave without any reduction in her vacation time.[68]

Plaintiff returned to work from her maternity leave on September 15, 2014, and was brought in to discuss her performance, as well as to meet with the subcommittee of CCC members consisting of Drs. Martel and Mammen, who would be responsible for supervising her.[69]

---

[64] (Defs.' SMF ¶ 62; Pl.'s CSMF ¶ 62.)

[65] (ECF No. 163-8, at 7.)

[66] (Pl.'s CSMF ¶ 297; Defs.' Reply SMF ¶ 297.)

[67] (Pl.'s CSMF ¶ 302; Defs.' Reply SMF ¶ 304; Blankenship Dep. Ex. 4, ECF No. 163-8, at 10.)

[68] (Defs. SMF ¶¶ 166–67; Pl.'s CSMF ¶¶ 166–67, 301; Defs.' Reply SMF ¶ 301.)

[69] (Defs.' SMF ¶ 64; Pl.'s CSMF ¶ 64.)

13

During the period of July 2014 to December 2014 ("PGY-3 First Semi-Annual Review

period"), issues with Plaintiff's performance were noted on several rotations by multiple faculty

physicians and on-call.[70] The issues included the following:

- Plaintiff's Plastics rotational evaluation, which was completed by Dr. Stefko (who had also completed Plaintiff's worst evaluation from her first year and voted to not promote her), was below level in almost all competencies and it was noted that Plaintiff did not interpret tests unless specifically asked to look them up, she could not describe the steps of an operative procedure, her medical records were poorly done or misleading, her examinations were unreliable, her medical knowledge was worrisome, she took feedback extremely poorly and her punctuality was a problem.[71]

- During the Glaucoma rotation, Dr. Waxman received an email from Dr. Nils Loewen to report that Dr. Loewen found two patients in tears because Plaintiff informed them that they would require surgery, when in fact surgery was not indicated. Dr. Loewen also reported that Plaintiff erroneously lasered a patient's cornea, and Dr. Schuman testified that Plaintiff did not take responsibility for the error, instead claiming that a "dirty lens" caused the problem. In addition, Dr. Schuman reported that Plaintiff had misdiagnosed a patient with retinal detachment in her only good eye, had so advised the patient, set up surgery and left the floor, all without speaking to Dr. Schuman. Dr. Schuman testified that the patient was weeping because she thought she was going to go blind in that one good eye. Plaintiff received a Level 2 or below on all competencies on this rotational evaluation completed by Dr. Loewen.[72]

- Dr. Kim Miller advised Dr. Waxman of five separate patient issues involving Plaintiff while she was on-call at the VA. According to Dr. Miller, the residents requested that Plaintiff not rotate at the VA as scheduled or, alternatively, "require 100% direct attending [physician] supervision of every patient she sees."[73]

---

[70] (Defs.' SMF ¶ 66; Pl.'s CSMF ¶ 66.)

[71] (Defs.' SMF ¶¶ 141, 308; Pl.'s CSMF ¶¶ 141, 308.)

[72] (Defs.' SMF ¶¶ 144–45, 147–48; Pl.'s CSMF ¶¶ 144–45, 147–48, 309–10; Defs.' Reply SMF ¶¶ 309–10.)

[73] (Defs.' SMF ¶¶ 142–43; Pl.'s CSMF ¶¶ 142–43.)

14

The rotational evaluations also showed some positive comments and scores, including a score of 100%, better than all her peers, on a Cornea quiz.[74]

On or about December 21, 2014, there was an incident between Dr. Susan Stefko and Plaintiff involving Plaintiff pumping her breast milk during working hours. Plaintiff asserts that Dr. Stefko told Plaintiff that she was "putting herself in front of her patients," and Plaintiff was instructed by Dr. Martel to obtain a note from a doctor outlining their recommendations for duration and frequency for pumping during the workday.[75] Plaintiff subsequently submitted a physician's note regarding her need to pump milk and filed a formal complaint of harassment with the Human Relations Office. But, Plaintiff also acknowledged that no one interfered with her ability to pump after that.[76]

On February 18, 2015, Plaintiff received her PGY-3 First Semi-Annual Review Letter ("Third Review Letter"), which Dr. Waxman had drafted with the CCC's review and input.[77] The Third Review Letter stated that the CCC had "grave concerns" regarding Plaintiff's performance over the prior six months; that she had been involved in a number of patient care incidents; that her rotational evaluations report showed that she lagged significantly behind her peers; that her medical knowledge as demonstrated during clinic, on-call and the OKAP was not "at level;" that she had been restricted from performing weekend call duties at Children's Hospital; and that she had not demonstrated the progression needed to safely fulfill the responsibilities of a second year in the Residency Program.[78] Plaintiff was advised that she was placed on probation and she would

---

[74] (Pl.'s CSMF ¶ 313; Defs. Reply SMF ¶ 313.)

[75] (Defs.' SMF ¶ 169; Pl.'s CSMF ¶¶ 169, 316; Defs. Reply SMF ¶ 316.)

[76] (4th Am. Compl., Ex. 2; Defs.' SMF ¶ 169; Pl.'s CSMF ¶ 169, 317; Defs. Reply SMF ¶ 317.)

[77] (Defs.' SMF ¶¶ 70, 71; Pl.'s CSMF ¶¶ 70, 71.)

[78] (Defs.' SMF ¶ 72; Pl.'s CSMF ¶ 72.)

not be renewed for the final year of residency if she did not substantially improve her performance by June 30, 2015.[79] The Third Review Letter enumerated specific recommendations for Plaintiff's improvement and indicated that Dr. Waxman and the other CCC members would closely monitor her.[80] Part of the monitoring involved Dr. Waxman conducting bi-weekly phone calls with Plaintiff to discuss patient cases.[81] Plaintiff appealed the decision to place her on probation with notification of non-renewal, citing her concern that she was being retaliated against as a result of her pregnancy, but that appeal was denied by an institutional committee.[82]

Issues with Plaintiff's performance along with some commendations were again noted on several rotations and on-call during the period beginning January 2015, through June 2015 ("PGY-3 Second Semi-Annual Review period").[83] Her feedback during the period is summarized by the following:

- On January 23, 2015, Drs. Mitchell, Mammen and Stefko recommended that Plaintiff be removed from on-call responsibilities at Children's Hospital until further notice based on several patient incidents.[84]

- Dr. Lope and Dr. Nichal reported that Plaintiff misdiagnosed three patients while on Peds call, and Dr. Lope noted that she would expect a resident at Plaintiff's level of training to be able to diagnose the problems, or at least recognize that the patients needed to be seen by an attending physician for accurate diagnosis.[85]

- During the first VA rotation, Dr. Stefko reported that Plaintiff was unable to present coherently or examine a patient independently, and the Milestone evaluation indicated

---

[79] (Defs.' SMF ¶ 73; Pl.'s CSMF ¶ 73.)

[80] (Defs.' SMF ¶ 74; Pl.'s CSMF ¶ 74.)

[81] (Defs.' SMF ¶ 75; Pl.'s CSMF ¶ 75.)

[82] (Defs.' SMF ¶ 76; Pl.'s CSMF ¶¶ 76, 321.)

[83] (Defs.' SMF ¶ 77; Pl.'s CSMF ¶ 77.)

[84] (Defs.' SMF ¶ 69; Pl.'s CSMF ¶ 69.)

[85] (Defs.' SMF ¶¶ 151, 152; Pl.'s CSMF ¶¶ 151, 152.)

that Plaintiff was slow in clinic, missed important findings and her exams were incomplete.[86] However, her review also contained positive comments, including "[Plaintiff] certainly 'passed' her rotation from my perspective and I wish her well."[87] During the second VA rotation, faculty feedback on Plaintiff's performance was mixed, with most faculty reporting that she had improved since her last rotation, and she was at the expected level.[88]

- During the Retina rotation, Dr. Martel noted that Plaintiff "missed multiple diagnoses that you would expect even a first year to be able to pick up on." Her Milestone evaluation indicated that she put forth good effort, worked hard in clinic, did well at taking history, but the faculty voiced uniform concern about her clinical knowledge base, exam skill and clinical judgment. Of the twenty (20) competencies rated, she had thirteen rated below level (or 2.5).[89]

In addition to the foregoing performance issues, Plaintiff scored in the bottom 4th percentile on the OKAP exam in the spring of 2015, which is a one percent drop from her bottom 5th percentile score in spring of 2014.[90] Dr. Waxman was talking to various faculty about the discussions he had had with Plaintiff, making it very clear to the faculty what was going on with her, but he did not take this course of action with any other residents in the program. But, the others were not on probation.[91]

On April 28, 2015, the CCC met specifically to discuss Plaintiff's performance, and it decided to require her to repeat rotations.[92] In May 2015, Dr. Waxman advised Plaintiff that her contract would only be renewed if she repeated a number of rotations, which essentially added a

---

[86] (Defs.' SMF ¶¶ 154, 155; Pl.'s CSMF ¶¶ 154, 155.)

[87] (Pl.'s CSMF ¶ 324; Defs.' Reply SMF ¶ 324.)

[88] (Defs.' SMF ¶ 156; Pl.'s CSMF ¶¶ 156, 326.)

[89] (Defs.' SMF ¶¶ 157–58; Pl.'s CSMF ¶¶ 157–58, 325; Defs. Reply SMF ¶ 325; ECF No. 163-1, at 274–85.)

[90] (Defs.' SMF ¶ 78; Pl.'s CSMF ¶ 78.)

[91] (Pl.'s CSMF ¶ 327; Defs.' Reply SMF ¶ 327.)

[92] (Defs.' SMF ¶ 79; Pl.'s CSMF ¶ 79.)

17

year to her residency.[93] Dr. Waxman advised Plaintiff that she would be required to repeat rotations in Consults, Glaucoma, Retina and Plastics, and she would be designated PGY-3 (second year) for HR purposes.[94] Dr. Waxman reminded Plaintiff that she was still on probation, which would continue until she demonstrated that she was "up to level for a period of time."[95]

Plaintiff continued her rotational schedule. She performed well in her Neuro-Ophthalmology rotation, with high competency levels and "significant progress reported by all three attendings."[96] Plaintiff's Milestone evaluation for the Peds rotation indicated that she made progress but several areas needed improvement. Specifically, it noted that Plaintiff's ability to put the ophthalmology exam within the context of the patient history was holding her back and sometimes led to her misdiagnosing problems. At the same time, the comments were more favorable, such as "we saw a lot of progress," "she is very easy to work with," "her knowledge base . . . is improved."[97]

On June 2, 2015, the CCC met and determined that Plaintiff was below level on nearly all competency Milestones, with the exception of Neuro-Ophthalmology in which she received a favorable review.[98] Plaintiff subsequently received her PGY-3 Second Semi-Annual Review Letter ("Fourth Review Letter") for the period of January through June 2015, which noted a trend toward improvement, made no reference to any incidents of harm or near harm to patients during

---

[93] (Defs.' SMF ¶ 80; Pl.'s CSMF ¶ 80.)

[94] (Defs.' SMF ¶¶ 81, 82; Pl.'s CSMF ¶¶ 81, 82.)

[95] (Defs.' SMF ¶ 81; Pl.'s CSMF ¶ 81.)

[96] (Pl.'s CSMF ¶ 328; Defs. Reply SMF ¶ 328.)

[97] (Defs.' SMF ¶ 162–63; Pl.'s CSMF ¶¶ 162–63, 331; Defs.' Reply SMF ¶ 331.)

[98] (Defs.' SMF ¶ 83–84; Pl.'s CSMF ¶ 83–84).

18

this period, and noted that her presentations during remediation have improved.[99] But it also stated that the "CCC remains very concerned about [Plaintiff's] performance" and she would "remain on probation with notification of termination."[100] The Fourth Review Letter also referenced that Plaintiff has expressed disagreement with negative assessments made of her performance and had referred to her own EEOC complaint, believing some assignments given to her are punitive rather than educational. She asked not to work with Dr. Stefko, whom she accused of creating a hostile work environment, which was denied. She had asked that her required scholarly project be decreased in size, which was also denied.[101]

An email between faculty physicians on June 23, 2015, shows one faculty physician, who did not sit on the CCC, inquire as to "why all the scrutiny of this particular resident," because Plaintiff, while slightly below average in some competencies, was "certainly not in the bottom 10 residents I have worked with other the last 11 years. What gives?"[102]

### 3. Repeat Second Year (PGY-3) and Termination

Plaintiff received a one-year contract beginning on July 1, 2015, until June 30, 2016, for an appointment at the PGY-3 level to repeat the second year of her residency, but she was still on probation.[103]

On July 16, 2015, Plaintiff was suspended due to an incident that occurred in the emergency room that day related to Plaintiff's alleged misdiagnosis and/or missed findings.[104] Dr. Schuman

---

[99] (ECF No. 163-1, at 325.)

[100] (Defs.' SMF ¶¶ 90, 91; Pl.'s CSMF ¶¶ 90, 91.)

[101] (Id.)

[102] (ECF No. 163, at 328.)

[103] (Defs.' SMF ¶¶ 92–93; Pl.'s CSMF ¶¶ 92–93.)

[104] (Defs.' SMF ¶ 95; Pl.'s CSMF ¶¶ 95, 346; Defs.' Reply SMF ¶ 346.) Plaintiff asserts that the incident was

19

concluded that Plaintiff missed important clinical findings, failed to call for attending physician backup, and failed to recognize that the patient was in imminent danger which could have resulted in the patient's blindness.[105] Plaintiff met with two physicians, Drs. Bonhomme and Mammen, to discuss the incident, and both of those physicians testified that the mistake involved was not one which would have gotten a resident fired, absent being on probation.[106] Dr. Schuman advised Plaintiff that she was being placed on administrative leave with pay.[107]

The CCC met on July 28, 2015, and a motion was made to terminate Plaintiff's residency.[108] Dr. Schuman asked Drs. Waxman and Stefko to step out of the meeting while the other CCC members voted on whether to terminate Plaintiff. The remaining members, Drs. Mitchell, Mammen, and Martal, unanimously voted to terminate Plaintiff's residency.[109] On

___

reported by Dr. Stefko, and Plaintiff disputes that the reported incident warranted concern for patient safety. However, Plaintiff cites no record evidence beyond her own subjective assessment to support her position. (Pl.'s CSMF ¶ 95).

[105] (Defs.' SMF ¶ 96.) Plaintiff admits that Dr. Stefko made those assessments about her performance, but disputes that the conclusions drawn based on Dr. Stefko's report were accurate. (Pl.'s CSMF ¶ 96). Again, Plaintiff provides no record support to substantiate a medically viable basis for her dispute.

[106] (Defs.' SMF ¶ 97; Pl.'s CSMF ¶¶ 97, 348; Defs. Reply SMF ¶ 348.) Dr. Mammen was a member of the CCC and Dr. Bonhomme was not.

[107] (Defs.' SMF ¶ 98; Pl.'s CSMF ¶ 98.)

[108] (Defs.' SMF ¶ 99; Pl.'s CSMF ¶ 99.)

[109] (*Id.*) Drs. Mitchell, Mammen, and Martal had all voted to promote Plaintiff from a first-year to a second-year resident in June 2014. (Defs.' SMF ¶¶48-49; Pl.'s CSMF ¶¶ 48-49.)

20

August 3, 2015, Plaintiff was terminated from the Residency Program.[110] Plaintiff filed a grievance with UPMC, appealing the termination decision, which was denied.[111]

Plaintiff filed a timely charge with the EEOC and was issued a right to sue notice on October 5, 2015.[112] This lawsuit followed.

## II.    STANDARD OF REVIEW

Summary judgment will be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To withstand summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson*, 477 U.S. at 248. When considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations, but rather is limited to deciding whether there are any disputed issues that are both genuine and material. *Id.*

If the moving party carries its burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive summary judgment. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325). The non-movant must respond "by pointing to sufficient cognizable evidence to create material issues

---

[110] (Defs.' SMF ¶ 100; Pl.'s CSMF ¶ 100.) (*See* Waxman Decl., Ex. 1.)

[111] (Defs.' SMF ¶ 101; Pl.'s CSMF ¶ 101.)

[112] (4th Am. Compl., Ex. 4.)

21

of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## III. DISCUSSION

Title VII prohibits employment discrimination because of, *inter alia*, an individual employee's sex. 42 U.S.C. § 2000e–2(a). The Pregnancy Discrimination Act ("PDA") is an amendment to Title VII stating that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions . . . " 42 U.S.C. § 2000e(k). Pursuant to the PDA, "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ." *Id.* Title VII also prohibits employers from discriminating or retaliating against employees for complaining about harassment or discrimination in the work place. 42 U.S.C. § 2000e-3(a).

"Disparate treatment based on the prohibited consideration of a woman's pregnancy 'is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate.'" *EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 650–51 (W.D. Pa. 2017) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.), order clarified, 543 F.3d 178 (3d Cir. 2008)). Plaintiff initially argues that she has presented direct evidence of discrimination and retaliation, but the Court disagrees. "Statements made by the decision-maker related to the decision or decision-making process at issue and reflecting the motive for that decision constitute direct evidence of motive." *Id.* at 651. As one district court noted, "[d]irect evidence in pregnancy discrimination cases is generally in the form of an admission by a decisionmaker that an employee's pregnancy affected an employment decision, such as suspending or terminating an employee because she was pregnant or delaying hiring an

22

applicant until after she has delivered her baby." *Wexler v. Kennesaw Pediatrics, P.C.*, No. 16-cv-1491, 2017 U.S. Dist. LEXIS 111038, at *44 (N.D. Ga. May 2, 2017).

Plaintiff propounds that the incident between Plaintiff and Dr. Stefko regarding Plaintiff's pumping during work is direct evidence of discrimination because Dr. Stefko "harass[ed] a nursing mother while she is expressing milk during her shift." (ECF No. 161, at 18–19). However, Plaintiff's characterization of the incident as "harassment" is unsupported by the record, and Plaintiff has advanced no record evidence connecting that comment in December 2014 to any negative action taken as to her, and she thereafter was able to pump as needed and without any issues.

Although Plaintiff was placed on probation in February 2015, Plaintiff has put forth no *direct* evidence that the CCC "placed substantial negative reliance on" Plaintiff's pumping to reach that decision. *Connors v. Chrysler Fin. Corp.*, 160 F.3d at 976. Therefore, her Title VII discrimination and retaliation claims are to be analyzed according to the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973): (1) first, the plaintiff must establish a prima facie case of discrimination or retaliation; (2) then, the burden shifts to the employer to advance a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action; (3) and finally, the plaintiff is afforded an opportunity to show that the employer's proffered reason was a pretext for discrimination or retaliation.[113]

## A. Pregnancy and Gender Discrimination Claims

Plaintiff asserts claims against UPMC for both pregnancy and gender discrimination based on three different "adverse actions:" (1) the February 2015, decision to place her on probation (the

---

[113] Claims arising under Title VII and the PHRA are analyzed coextensively. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

"Probation Requirement"); (2) the May 6, 2015, decision that she repeat rotations, which essentially added a year to her residency (the "Repeat Requirement"); and (3) terminating her from the Residency Program on August 3, 2015 (the "Program Termination").[114] As discussed below, the Court concludes that Plaintiff has not met her prima facie burden on either a stand-alone gender or a pregnancy discrimination claim.[115] Even if Plaintiff had done so, her claims still fail because she has not shown that a factfinder could reasonably conclude that UPMC's reason for each of the three adverse actions were pretexts for pregnancy and/or gender discrimination. Accordingly, the Court will grant Defendants' Motion for Summary Judgment on these claims.

### *1. Plaintiff Has Not Established a Prima Facie Case of Pregnancy or Gender Discrimination*

To establish a prima facie case of pregnancy discrimination, a plaintiff must show that: (1) she was pregnant and her employer was aware of her pregnancy; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there is a causal nexus between her pregnancy and the adverse employment action. [116] *C.A.R.S*, 527 F.3d at 365. UPMC challenges the second and fourth elements.

UPMC argues that Plaintiff cannot show that she was qualified to continue through the residency program. Our Court addressed this argument in the medical residency context in *Brown*

---

[114] (4th Am. Compl. ¶¶ 47, 48, 57, 65.)

[115] Defendants argue that the EEOC charge did not contain any facts to support a gender discrimination claim, thus that claim is barred because Plaintiff did not properly exhaust her administrative remedies. Plaintiff disagrees, contending that the EEOC charge alleged discrimination under Title VII and the PDA. Though the allegations of Plaintiff's EEOC charge focus on pregnancy discrimination, she stated at the outset that she was filing her discrimination charge under the PDA and Title VII. (*See* ECF No. 143, Tab P). The EEOC issued Plaintiff a notice indicating that she had the right to institute a civil action under Title VII. (Fourth Am. Compl., Ex. 4). As one district court reasoned, "[s]ince discrimination based on pregnancy is, by statute, discrimination based on sex, . . . it seems reasonable to conclude that an administrative charge based on pregnancy discrimination can support a later-added judicial charge based on sex discrimination." *Nelson v. Wittern Grp., Inc.*, 140 F. Supp. 2d 1001, 1009 (S.D. Iowa 2001). This Court agrees with that reasoning in *Nelson* and will consider Plaintiff's gender discrimination claim as one properly before the Court.

[116] A prima facie case of gender discrimination differs slightly from that of pregnancy discrimination, in that the first

24

*v. Hamot Medical Center*. No. 05-cv-32E, 2008 U.S. Dist. LEXIS 467, at *21–26 (W.D. Pa. Jan. 2, 2008), *aff'd*, 323 F. App'x 140 (3d Cir. 2009). Like Plaintiff, Brown, a medical resident, had well-documented poor academic performance (but also with some positive reviews), failed to demonstrate competency in certain core areas, and tested in the near-bottom percentile on her standardized exams. *Id.* at *21–22. Brown appealed the district court's grant of summary judgment, arguing she was qualified, but our Court of Appeals affirmed, briefly noting that "the [District] Court correctly concluded that Brown failed to establish a prima facie case." 323 F. App'x at 143. *Brown*, therefore, undercuts Plaintiff's arguments that she meets her burden to show she was qualified for the position by solely by virtue of "her past education and clinical achievements . . . which Defendants relied upon in admitting her to the program." (ECF No. 161, at 15.) This argument may have been more persuasive had Plaintiff been subject to adverse action immediately upon admittance to the program, but the record in this case is clear that Plaintiff was expected to demonstrate stronger proficiencies as she progressed through the program. In other words, the credentials that got Plaintiff into the program were not enough to advance her through the program. Even viewing the evidence in the light most favorable to Plaintiff, the record is clear that at the time Plaintiff was required to repeat rotations, she was not qualified to advance to third-year residency status and at the time she was terminated, she was not qualified to remain in the program.[117]

Plaintiff argues that her "work record was overwhelmingly positive, except for the tainted evaluations concocted by Dr. Waxman, Dr. Stefko, and their cronies." (ECF No. 161, at 15.) The

element of a pregnancy discrimination prima facie case requires the employer to have actual knowledge of an employee's pregnancy. *C.A.R.S.*, 527 F.3d at 365. The remaining elements are the same. *Id.* As UPMC does not challenge the first element of either prima facie case, the Court's analysis may proceed coextensively for pregnancy discrimination and gender discrimination.

[117] Plaintiff also points to being placed on probation after her second first-year review as one instance of pregnancy and gender discrimination. UPMC does not argue that, in this instance, she was not qualified to remain in the

25

record simply does not support this argument. The record in this case as it pertains to Plaintiff's rotational evaluations and test scores is virtually undisputed and simply does not reflect, by any measure, an "overwhelmingly positive" record, and, more importantly, Plaintiff has failed to introduce any evidence that the negative evaluations were "concocted." The minute entry in which Dr. Waxman stated that he may be "prejudiced" towards Plaintiff is insufficient, as it sheds no light on whether he concocted poor evaluations or encouraged others to do so. And, regardless, this comment creates no inference that Dr. Waxman's "prejudice" was based on Plaintiff's Title VII-protected status. After all, "prejudice" is simply "a preconceived judgment or opinion," *Prejudice*, Merriam-Webster Dictionary (3d ed. 2019), and is not perforce evidence of any unlawful conduct, nor does its use, without more, support an inference of such. And, nothing in the CCC minutes indicate that the basis for that "prejudice" was related to Plaintiff's gender or pregnancy.[118] Plaintiff has also failed to put forth any evidence from which a jury could rationally conclude that the poor evaluations (completed by a variety of doctors, some of whom were on the CCC and others who were not) were unsubstantiated or otherwise fairly called into question. Her standardized test scores were repeatedly about as low as they could go. Multiple other doctors repeatedly observed patient risk issues with her performance. The record does not undercut these realities. Therefore, Plaintiff will not be able to satisfy the second element of her prima facie case

_____

program, as she was, in fact, advanced to second-year status.

[118] For instance, and to the contrary, in her deposition, Plaintiff admitted that she wrote on social media that she was "discriminated against as a foreign [medical school] grad" during her tenure in the Residency Program. (Pl.'s Dep. 404:10–16, ECF No. 143-4, at 59.)

26

with respect to two of the three alleged adverse actions: the Repeat Requirement and the Program Termination. *See* note 117 *supra*.

The Court now turns to the fourth element, which it concludes is fatal to all Plaintiff's instances of alleged discrimination, including the Probation Requirement. The means by which a claimant most often satisfies the fourth element is by showing that she was treated less favorably than similarly situated employees who are not in the same protected class, i.e., non-pregnant persons. *Doe*, 527 F.3d at 366. Although Plaintiff points to several residents (Dr. J.L., Dr. A.Z. and Dr. V.S.) as comparators, and argues that they were permitted to graduate from the Residency Program despite their purported deficient medical knowledge and performance,[119] she has failed to show that they were similarly situated to her.

"While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).[120] Plaintiff is not similar in "all relevant respects" to Dr. J.L., Dr. A.Z. and Dr. V.S. Drs. J.L and A.Z. began their residencies in July 2011, and Dr. V.S. graduated from the Residency Program in July

---

[119] (ECF No. 161 at 15, 19; Pl.'s CSMF ¶¶ 237–41; Defs.' Reply SMF ¶¶ 355–58.)

[120] The Eleventh Circuit recently confirmed in an en banc decision that "a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Lewis v. City of Union City*, No. 15-11362, slip op. at 2019 U.S. App. LEXIS 8450, at *4–5 (11th Cir. Mar. 21, 2019). While the Eleventh Circuit acknowledged that "all material respects" will vary case to case, "[o]rdinarily," a similarly situated comparator "will have been subject to the same employment policy, guideline, or rule as the plaintiff." *Id.* at 25.

2012.[121] Plaintiff began her residency in July 2013. This is significant because in 2013, the Residency Program fundamentally changed its evaluation process. In 2013, CCC was formed and the Residency Program began using Milestones Evaluations.[122] None of the other resident doctors that Plaintiff points to as comparators were subject to the same review process or standard of evaluation, let alone by the same group of decision-makers as Plaintiff.[123] Therefore, Plaintiff has not shown that "similarly situated" non-pregnant female or male residents were treated more favorably than her.

However, "identifying a similarly situated employee is not the only way to meet the fourth prong of the test." *Rifai v. CMS Med. Care Corp.*, No. 15-1395, 2017 U.S. Dist. LEXIS 153680, at *11 (E.D. Pa. Sep. 21, 2017). "Rather, evidence of other circumstances demonstrating that the adverse employment action was 'based on an illegal discriminatory criterion' is sufficient to meet plaintiff's burden." *Dawson v. Harran*, No. 08-cv-7, 2009 U.S. Dist. LEXIS 69428, at *19 (E.D. Pa. Aug. 6, 2009) (citing *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 356 (3d Cir. 1999). Plaintiff has failed to put forth evidence that adverse action was taken based on her gender or pregnancy. Even if the Court agreed with Plaintiff that a reasonable jury could conclude that Drs. Waxman and Stefko harbored an unlawful discriminatory motive, the adverse actions alleged here were actions taken by the CCC—not them—as Dr. Waxman abstained from the CCC's votes on the Repeat Requirement and the Program Termination and Dr. Stefko abstained from the Program Termination vote. Regardless, Plaintiff has failed to introduce record evidence to show that the other members of the CCC, who formed a majority of the CCC, based their decisions regarding

---

[121] (Defs.' Reply SMF ¶¶ 355, 357–58.)

[122] (Defs.' SMF ¶¶ 15, 17, 32; Pl.'s CSMF ¶¶ 15, 17, 32.)

[123] Notably, the five other residents in Plaintiff's class, including one female, successfully completed the Residency Program. (Defs.' SMF ¶¶ 170, 171; Pl.'s CSMF ¶¶ 170, 171.)

28

Plaintiff's employment on illegal discriminatory criterion. *See O'Toole v. Acosta*, No. 14-cv-2467, 2018 U.S. Dist. LEXIS 49678, at *65 (N.D. Ill. Mar. 26, 2018) ("Showing that discrimination motivated an employer's actions becomes difficult where the action, as here, involves multiple decision-makers.")

Because Plaintiff has not met her prima facie burden, the Court would grant Defendants' Motion for Summary Judgment on that basis alone. As discussed below, however, even if Plaintiff has made out a prima facie case of pregnancy or gender discrimination, Defendants have met the relatively light burden of offering a legitimate, non-discriminatory reason for the Probation Requirement, the Repeat Requirement and the Program Termination, and Plaintiff has failed to advance record evidence from which a rational factfinder could conclude that UPMC's reasons for the adverse actions were pretext.

### 2. UPMC Has Offered a Legitimate Non-Discriminatory Reason for the Probation Requirement, the Repeat Requirement and the Program Termination

At the second step of the *McDonnell Douglas* analysis, an employer's burden of production is relatively light and is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a legitimate, non-discriminatory reason for the unfavorable employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Relevant here, "demonstrably poor job performance" qualifies as a legitimate, nondiscriminatory reason for termination. *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).

UPMC has advanced record evidence that there were persistent, significant issues with Plaintiff's performance on various rotations and on-call during Plaintiff's first and second year of residency. The CCC advised Plaintiff about their serious concerns with her performance in the Second Review Letter, the Third Review Letter, and the Fourth Review Letters. In her first year, the CCC decided that a subcommittee would meet with Plaintiff to help keep her on track for

timely graduation. When issues with Plaintiff's performance persisted in her second year, the CCC placed Plaintiff on probation, advised that she would not be renewed for the final year of her residency if she did not substantially improve her performance, and closely monitored Plaintiff with bi-weekly phone calls with Dr. Waxman. And, it is undisputed that among the performance issues noted was a deficiency in Plaintiff's "fund" of medical knowledge, which was consistent with her very, very low scores on her two OKAP exams. As Plaintiff's performance issues continued in the second half of her second year, the CCC decided that Plaintiff would be required to repeat rotations, essentially adding a year to her residency. Plaintiff was informed that she would remain on probation with notification of termination. During the repeat of second year, Plaintiff was removed from seeing patients based on an incident which raised a concern that she was a threat to the safety of patients. The CCC subsequently voted to terminate Plaintiff's residency.

Plaintiff's unsatisfactory performance in those areas is a lawful, non-discriminatory reason for the Probation Requirement, the Repeat Requirement and the Program Termination. Therefore, this articulated reason more than satisfies UPMC's relatively light burden of offering a legitimate, non-discriminatory reason for the adverse employment decisions.

### 3. *Plaintiff Has Failed to Demonstrate that UPMC's Legitimate Reason Could Be Reasonably Found to Be a Pretext for Pregnancy or Gender Discrimination*

Given that UPMC has met its burden at step two of the *McDonnell Douglas* protocol, the burden shifts back to Plaintiff to show that the stated reason for the adverse employment actions was a pretext for pregnancy or gender discrimination. To defeat summary judgment at the pretext stage, a plaintiff must point to record evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious

30

discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764 (citations omitted).

Under the first prong of *Fuentes*, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder could rationally find them unworthy of credence," and infer that the defendant did not act for the stated non-discriminatory reasons. *Fuentes*, 32 F.3d at 765. Here, Plaintiff critiques the CCC's evaluation process as it relates to her, but simply arguing that the CCC was wrong or employed a process that she disagreed with is not enough to survive summary judgment. *See Fuentes*, 32 F.3d at 765 (plaintiff cannot simply show that employer's decision was wrong or mistaken).

This is especially true in the field of medical education, where our Circuit has long recognized that, in the pretext inquiry, "decisions made by university faculties, both in the medical field and otherwise, are entitled to heightened deference." *Sidique v. Univ. of Pittsburgh Dep't of Dermatology*, No. 02-cv-365, 2003 U.S. Dist. LEXIS 20473, at *13 (W.D. Pa. Oct. 3, 2003). "A medical residency is a hybrid position in which the resident is both a student and employee. However, it is primarily a learning position . . . ." *Abdel-Raouf v. Yale Univ.*, No. 12-cv-776, 2015 WL 687440, at *3 (D. Conn. Feb. 18, 2015) (citation omitted). "Where an employment relationship is primarily educational, courts . . . have recognized that judges and juries are singularly unequipped to review judgments about professional qualification." *Id.* (concluding that plaintiff did not prove he was qualified to be promoted to a third-year resident because he offered no evidence to establish that he was qualified for promotion except to dispute every less-than-

31

laudatory comment made by his attending physicians); *Nigro*, 492 F. App'x at 359 (reiterating that "courts are particularly ill-equipped to evaluate academic performance").

Our Court of Appeals applied this heightened deference in *Hankins v. Temple Univ. Health Scis. Ctr.*, 829 F.2d 437, 443 (3d Cir. 1987), in which the plaintiff, a medical fellow, argued that the faculty and staff at the hospital were mistaken in their assessment of her medical skills and their decision to terminate her fellowship. *Id.* The plaintiff in *Hankins* did not meet the standards set by Temple Medical School for continuation in its fellowship program after it was determined that she was deficient in clinical skills and judgment, demonstrated reluctance to respond to constructive criticism and abandoned a patient under her care on one occasion. *Id.* The Third Circuit noted that "[u]niversity faculties . . . must have the widest discretion in making judgments as to the academic performance of their students." *Id.* (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J., concurring)).[124] As such, the plaintiff failed to demonstrate that the stated reason for her termination – inadequate performance—could be found to be a pretext for discrimination, and our Court of Appeals affirmed the district court's grant of the defendant's motion for summary judgment. *Id.* at 441.

Similarly, here, issues with Plaintiff's performance were noted on her very first PGY-2 rotation in the Residency Program well before she disclosed her pregnancy and these specific performance problems continued on various rotations and "on-call" during her first and second year. Although it is undisputed that Plaintiff received some positive feedback and some at or above-level ratings in certain rotations, and that she obtained a fellowship in a specific subspecialty

---

[124] *See also Sidique*, 2003 U.S. Dist. LEXIS 20473, at *12–14 (applying *Hankins* and concluding plaintiff failed to establish a reasonable inference of discriminatory animus in university's decision to deny plaintiff admission to its residency program); *Castillo v. Am. Bd. of Surgery*, 221 F. Supp. 2d 564, 571 (E.D. Pa. 2002) (quoting *Hankins*'s holding that "university faculties . . . must have the widest discretion in making judgments as to the academic performance of their students); *Linson v. Trs. of the Univ. of Pa.*, No. 95-cv-3681, 1996 U.S. Dist. LEXIS 12243, at *18 (E.D. Pa. Aug. 21, 1996) (applying *Hankins* to graduate student's Title XI retaliation claims and granting defendant's motion for summary judgment).

in which she had generally performed well, the CCC ultimately concluded that Plaintiff's overall performance was inadequate to remain in the Residency Program. *See Brown*, 323 F. App'x at 142–43 (affirming grant of summary judgment on medical resident's gender discrimination claim where the plaintiff was not promoted due to performance deficiencies; although the plaintiff received some positive comments and evaluations, each evaluation stated that she needed to improve and increase her knowledge base); *Nigro v. Va. Commw. Univ./Med. Coll. of Va.*, 492 F. App'x 347, 360 (4th Cir. 2012) (plaintiff was not qualified to remain in residency program despite having received many average evaluations where, *inter alia*, record contained ample evidence that her performance in some rotations was deficient, her knowledge lagged behind peers and she was unwilling to take responsibility for shortcomings).

As noted above, Plaintiff has presented no evidence that Dr. Waxman "concocted" poor evaluations or encouraged others to do so, and even if Dr. Waxman was acting out of a personal discriminatory motive, he abstained from both the CCC's vote to not promote Plaintiff and the CCC's vote to terminate Plaintiff. *See Sidique*, No. 02-365, 2003 U.S. Dist. LEXIS 20473, at *19 (W.D. Pa. Oct. 3, 2003) ("The Plaintiff does not identify any evidence calling into question the credibility of the remaining five Committee members, and his counsel has failed to show that his ultimately unavailing attack on a single member's score is sufficient to establish a reasonable inference of discrimination."). *See also Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066 (7th Cir. 2003) (In multiple decision maker cases, plaintiff must "present evidence from which a reasonable jury could infer that [one decision maker's] prejudicial views influenced their fellow panel members to such a degree that it resulted in their being terminated."); *Blair v. Atlanta Gastroenterology Assocs.*, No. 1:05-cv-2811, 2007 U.S. Dist. LEXIS 48556, at *25 (N.D. Ga. July 2, 2007) (finding

33

no causal connection between one decision maker's discriminatory statements and an adverse employment decision made by nine decision makers).

The CCC's concerns are well-documented and were conveyed to Plaintiff on a number of occasions, and she disagreed with the CCC's evaluation of her performance. But, to be clear, much of the record in this case as it pertains to Plaintiff's documented performance is undisputed. Plaintiff admits:

- During her PGY-2 First Semi-Annual Review period, her Plastics rotation evaluation noted concerns for her fund of medical knowledge, decision-making and willingness or ability to take responsibility for her actions; her Retina rotation evaluation noted an inability to correctly see the back of the eye and that led to misdiagnosis of some potentially serious conditions like retinal detachment, which someone at her level would be expected to identify; her Consults rotation resulted in a report from Dr. Kim Miller indicated that Plaintiff misdiagnosed a patient with a ruptured globe and a report from Dr. Savannah Baril expressing serious concerns regarding Plaintiff's clinical performance. [125]
- During Plaintiff's PGY-2 Second Semi-Annual Review period, rotational evaluations reflected concerns about her medical knowledge, examination findings, diagnosis, and treatment plans. In Consults, there were concerns that she frequently did incomplete consults that were inaccurate in a number of respects, she missed very elementary findings on exams and she did not follow up on patient issues or had to be asked several times to do so, and other residents expressed concerns for her medical knowledge.
- Each of the two times Plaintiff took the OKAP, she scored in the bottom 5th percentile or below of all national test-takers.
- During her PGY-3 First Semi-Annual Review period, Plaintiff's Plastics rotation evaluation showed inability to interpret tests, poor medical charting, and worrisome medical knowledge; her Glaucoma rotation included a report from Dr. Loewen that she erroneously informed patients that they needed surgery and erroneously lasered a cornea, and she misdiagnosed conditions; on her VA rotation, there were five separate patient issues, and other residents ask that Plaintiff receive direct attending supervision when working with patients.[126]
- During her PGY-3 Second Semi-Annual Review period, three doctors recommended that Plaintiff be removed from on-call responsibilities at Children's Hospital based on incidents; Drs. Lope and Nichal noted three misdiagnoses during

---

[125] (Defs.' SMF ¶¶ 113, 117, 119, 121, 122; Pl.'s CSMF ¶¶ 113, 117, 119, 121, 122.)

[126] (Defs.' SMF ¶¶ 141–148; Pl.'s CSMF ¶¶ 141–48.)

34

Plaintiff's Peds rotation; and Plaintiff missed multiple diagnoses in her Retina rotation.[127]

Plaintiff's subjective disagreement with the assessments of the practicing and teaching physicians, and her belief that the CCC was mistaken in assessing her performance, deciding to attempt remediation, and subsequently terminating her residency when remediation was unsuccessful, is insufficient to carry the day.[128] *See Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("Billet primarily disagreed with the objective evidence against him, e.g., his evaluation, misconduct probation, and relationship with underwriting, and argued that his performance was adequate. . . . The fact that an employee disagrees with an employer's evaluation of him does not prove pretext."); *Kane v. Gap, Inc.*, No. 17-cv-1265, 2018 U.S. Dist. LEXIS 195047, at *25 (M.D. Pa. Nov. 15, 2018) ("[P]laintiff's subjective disagreement with her supervisor's performance evaluations is not evidence of pretext."). As in *Hankins*, Plaintiff has failed to demonstrate that the stated reason for the Probation Requirement, the Repeat Requirement and the Program

---

[127] (Defs.' SMF ¶¶ 69, 151–52, 154–62; Pl.'s CSMF ¶¶ 69, 151–52, 154–62.)

[128] Two points bear repeating: (1) "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Horowitz*, 435 U.S. at 96, n.6 (Powell, J., concurring); and (2) "Where an employment relationship is primarily educational, courts . . . have recognized that judges and juries are singularly unequipped to review judgments about professional qualification." *Abdel-Rauof*, 2015 WL 687440, at *3 (collecting decisions). In view of these principles, the CCC had wide discretion in conducting its "360-review" of Plaintiff to determine whether she ultimately would graduate from the Residency Program. (Defs.' SMF ¶¶ 13, 25; Pl.'s CSMF ¶¶ 13, 25). In making that determination, it is notable that good performance by a resident in one or two subspecialties would not negate serious deficiencies in other areas. (Defs.' SMF ¶ 26; Pl.'s CSMF ¶ 26). Logically, it does not cut it that a doctor need only do one or two things well, since they are responsible for the full sweep of patient care within their field. Accordingly, Plaintiff's positive evaluations in certain rotations do not negate the documented performance deficiencies in other rotations and in "on-call" assignments identified by the CCC. Thus, some positive evaluations do not, in these circumstances, create an inference that the decision to terminate her from the Residency Program because of unsatisfactory performance in the areas of medical knowledge, patient care and patient safety was a pretext for pregnancy or gender discrimination.

35

Termination – inadequate performance—could be rationally found unworthy of belief and hence a pretext for discrimination.[129]

Moving to the second prong of *Fuentes*, a plaintiff can demonstrate pretext if she can demonstrate that discrimination "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. Pretext can be shown this way by producing evidence that: 1) the employer previously has discriminated against the plaintiff; 2) the employer has discriminated against other persons; or 3) the employer has treated more favorably similarly situated employees outside of the plaintiff's protected class. *See Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765). Plaintiff cannot prevail on this prong either.

Plaintiff has not argued or presented evidence that UPMC previously discriminated against her, nor has she shown that UPMC treated more favorably similarly situated employees who are not in her protected class. Although Plaintiff attempts to establish pretext by arguing that UPMC discriminated against Dr. S.A., who also became pregnant in the first year of her residency, the record evidence is to the contrary.

After Dr. S.A. started her residency in 2011, it was determined that she had performance deficiencies that would require her to repeat her first year of training. (*See* Waxman Decl., Ex. 2). Dr. S.A. *requested* and received additional time off, *and she* decided to start her first year anew in July 2012.[130] Those decisions were hers, not those of the Residency Program. Plaintiff's assertion that Defendants discriminated against Dr. S.A. is contradicted by Dr. S.A.'s own testimony that she holds Dr. Schuman in the highest regard and that he supported her, as did Dr. Waxman and

---

[129] To the extent Plaintiff argues that UPMC utilized assessment criteria that was imprecise or otherwise imperfect, absent record evidence that the assessment methodology was itself unlawfully discriminatory, it is beyond the role of the Court to second guess that process. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005).

[130] (Dr. S.A. Dep. ECF No. 172, Tab S, at 92:17–92:22).

Dr. Stefko.[131] Although Dr. S.A. testified that she was fearful of Dr. Waxman, she explained that Dr. Waxman was a mentor to her, he wrote her a letter of support when she applied for a fellowship and he said very positive things about her when she interviewed for jobs.[132] Importantly, Dr. S.A.'s testimony does not establish that UPMC discriminated against her, and Plaintiff points to no other record evidence showing that UPMC discriminated against her or any other ophthalmic residents. Further Plaintiff concedes that there were numerous residents who gave birth during their residency and also successfully graduated from the Residency Program without any extension of training, and that they did so when Dr. Schuman and Dr. Waxman served as Chair of the Ophthalmology Department and Program Director, respectively.[133]

In sum, even if Plaintiff could show a prima facie case, Plaintiff has not advanced record evidence sufficient to show pretext under either prong of *Fuentes*. Therefore, Plaintiff's pregnancy and gender discrimination claims fail as a matter of law, and summary judgment will be entered in favor of UPMC on Counts I and II.

## B. Retaliation Claims

Plaintiff also alleges that she was retaliated against for complaining about alleged discrimination due to her pregnancy. UPMC argues that Plaintiff has failed to establish a prima facie case of retaliation. Even if Plaintiff had done so, UPMC asserts that it had a legitimate, non-

---

[131] (*Id.* at 127:4; 127:15; 151:24–152:1.)

[132] (*Id.* at 131:8-131:20.)

[133] (Defs. SMF ¶ 172; Pl.'s CSMF ¶ 172).

37

retaliatory reason for the Probation Requirement, the Repeat Requirement and the Program Termination, which Plaintiff has not shown was a pretext for retaliation.

## *1. Plaintiff Establishes a Prima Facie Case of Retaliation*

To state a prima facie case of retaliation, a plaintiff must establish that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

Plaintiff alleges that she engaged in the following protected activity: (1) on July 15, 2014, she approached UPMC's Ombudsman about discrimination and retaliation by Dr. Waxman due to her pregnancy (the "July 2014 complaint"); (2) on December 21, 2014, Plaintiff filed an internal complaint for Dr. Stefko's comments about Plaintiff pumping (the "December 2014 internal complaint"); (3) she appealed the CCC's decision in February 2015, to place her on probation (the "February 2015 appeal"); and (4) on April 18, 2015, she filed a charge with the EEOC, which was subsequently amended on June 5, 2015 (the "April/June 2015 EEOC charge"). UPMC does not dispute that Plaintiff engaged in these activities.

UPMC also does not dispute that the Probation Requirement (January–February 2015),[134] the Repeat Requirement (May 2015), and the Program Termination (July 28, 2015) could be found

---

[134] The parties do not put forth exactly when the decision to place Plaintiff on probation was actually made. The record is clear that the CCC met on January 6, 2015 to discuss the Plaintiff and other resident's performances for the PGY-3 First Semi-Annual Review period. (Defs.' SMF ¶ 67; Pl.'s CSMF ¶ 67.) Dr. Waxman then drafted the Third Review Letter, asked members of the CCC for input, and delivered the letter, which notified Plaintiff of her probationary status, to her on February 18, 2015. Dr. Waxman's deposition indicates that, at the time the CCC met on January 6, 2015, "a decision [could not] be made regarding promotion." (Waxman Dep. 272:16–17, ECF No. 157-2, at 87.) Dr. Waxman also testified that the decision to place Plaintiff on probation was not made at the January 6, 2015, CCC meeting but could not estimate when he drafted the Third Review Letter and consulted the CCC (*Id.* at 273:11–13; 274:5–9.) Thus, there is a genuine issue of fact as to precisely when in that time window the decision to place Plaintiff on probation was made. For the reasons noted, the Court will view this in the light most favorable to Plaintiff, and the dispute is not material to the determination here.

to constitute adverse employment actions. UPMC contends, however, that Plaintiff has not sufficiently established a causal connection between the protected activity and an adverse employment action(s).

To establish such a causal connection, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action."[135] *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (citation omitted). A plaintiff may rely on "a broad array of evidence" to show the requisite causal link. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). Such evidence may include a temporal proximity between the protected activity and the adverse action, intervening antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action or any other evidence that supports an inference of retaliatory animus. *See id.* at 232–33.

The temporal proximity between the protected activity and the adverse action in this case is "not so close as to be unduly suggestive" for either Plaintiff's July 2014 complaint or her February 2015 appeal of the Probation Requirement.[136] The remaining two instances are closer

---

[135] Citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), UPMC states that Title VII retaliation claims must be proved according to traditional principles of but-for causation. *Nassar* held that a retaliation plaintiff's ultimate burden is to prove that retaliatory animus was the "but-for" cause of the adverse employment action, but at the prima facie stage, the plaintiff has a lesser burden and must demonstrate causation by producing evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious*, 851 F.3d at 258, 259. As explained herein, Plaintiff has not demonstrated that the causation element of a prima facie case can be met under this standard.

[136] These both occurred more than two months prior to any subsequent adverse action, and the appellate decisions in this Circuit consistently hold that "[f]or temporal proximity between protected activity and an adverse action to establish causation on its own, the gap must be very close." *See Eskridge v. Phila. Hous. Auth.*, 722 F. App'x 296, 300 (3d Cir. 2018). More than two months' time is insufficient to show a causal connection. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760–61 (3d Cir. 2004) (finding no causal connection where over two months elapsed between protected activity and adverse employment action). First, Plaintiff's July 2014 complaint occurred approximately seven (7) months prior to the first adverse action—the Probation Requirement in February 2015. Second, Plaintiff's February 2015 appeal of the Probation Requirement occurred approximately three (3)

calls. "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," unduly suggestive temporal proximity usually falls within periods of days or weeks, not months. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two months is not unusually suggestive).

The December 2014 internal complaint—related to Dr. Stefko's pumping comments on December 21, 2014—and the Probation Requirement in January–February 2015 has a temporal proximity as short as sixteen days and as long as two months. *See* note 134 *supra*. However, sixteen days "'qualifies as unusually suggestive timing' and would be evidence of a causal connection between Plaintiff's" protected act and adverse action against her. *Pizzo v. Lindenwold Bd. of Educ.*, No. 13-cv-03633, 2015 U.S. Dist. LEXIS 41499, at \*35 (D.N.J. Mar. 31, 2015) (sixteen days between protected act and adverse employment action qualifies as "unusually suggestive timing").

Second, considering the date that Plaintiff amended her EEOC charge, June 5, 2015, the temporal proximity between the EEOC charge and the CCC's decision to terminate is slightly under eight (8) weeks. However, this alone is insufficient to constitute "unusually suggestive" temporal proximity. *See Bailey v. Commerce Nat'l Ins. Servs.*, 474 F. Supp. 2d 577, 584 (D. Del. 2007) ("[E]ven when utilizing the shorter eight-week period to measure temporal proximity, the court finds that the length of time between the end of the investigation and defendant's decision to fire plaintiff is not 'unusually suggestive of retaliatory motive.'" (internal citation omitted)); *Lee v. Comhar, Inc.*, No. 05-cv-1781, 2006 U.S. Dist. LEXIS 30618, at \*12 (E.D. Pa. May 18, 2006)

---

months before she was subject to the Repeat Requirement in May 2015.

(dismissing Title VII retaliation claim because eight-week temporal proximity without other evidence is insufficient to survive summary judgment).

The Court concludes that Plaintiff can establish a prima facie case of retaliation with respect to the instance involving the pumping comment. UPMC's argument that this was merely a "stray remark" is insufficient to overcome the suggestive nature of the temporal proximity. First, the comment was made by a decision-maker, a member of the CCC. Second, it related directly both to Plaintiff's job and her recent pregnancy, and was communicated directly to her, as opposed to what has been referred to in other cases as "office banter." Third, it has suggestive temporal proximity to the meeting of the CCC, which led to Plaintiff's probation. *See Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997) (discussing characteristics of stray remarks). To the extent UPMC argues that the alleged comment was mischaracterized, a fact-finder, not the Court on summary judgment, would have to sort out what happened.[137]

Plaintiff is unable to establish a prima facie case with respect to the other alleged instances. To the extent Plaintiff argues that the CCC's decision to remediate her and institute various measures to monitor her work, the existence of the remediation efforts cannot be construed as antagonistic, absent record evidence supporting such an inference. As explained, the goal of the Residency Program is to train future ophthalmologists to practice safely, competently and independently in all aspects of ophthalmology. Therefore, the CCC must ensure each resident is up to that entire task, and will not certify the credentials of an underperforming resident just for the sake of passing him or her through the Residency Program. As discussed, the CCC documented Plaintiff's performance deficiencies, communicated them to her and attempted to remediate her,

---

[137] In so concluding, the Court is giving Plaintiff a significant benefit of the doubt given the context of Dr. Stefko's remark, e.g. relative to Plaintiff's prioritizing of tasks, not the fact of her pumping breast milk *vel non*, especially in light of the reality that the record reveals Plaintiff's unimpeded pumping thereafter.

but ultimately concluded that she was not progressing and was not qualified to remain in the Residency Program.

With respect to the July 2014 complaint, the February 2015 appeal, and the April/June 2015 EEOC charge, Plaintiff has failed to establish a prima facie case of retaliation. However, because the Court concludes that Plaintiff has met her burden to establish a prima facie case of retaliation with respect to the December 2014 internal complaint, the Court's analysis continues. As explained below, UPMC has met its burden of offering legitimate, non-retaliatory reasons for all the alleged adverse actions, which Plaintiff is not be able to rebut. Therefore, Plaintiff's claims for retaliation do not survive Defendants' Motion for Summary Judgment.

### 2. *UPMC Has Offered a Legitimate, Non-Retaliatory Reason For the Probation Requirement, the Repeat Requirement and the Program Termination, Which Plaintiff Has Failed to Show Was a Pretext for Retaliation*

For the same reasons that UPMC satisfied its burden with respect to Plaintiff's gender and pregnancy discrimination claims, UPMC has satisfied its burden of offering a legitimate, non-retaliatory reason for the Probation Requirement, the Repeat Requirement and the Program Termination; that is, her inadequate performance. *See supra* Part III.A.2.

The burden thus shifts back to Plaintiff to show that the stated reason was a pretext for retaliation. For the same reasons discussed in the context of Plaintiff's discrimination claims, she cannot establish pretext under either prong of *Fuentes*. Under the first prong, Plaintiff has not shown that the stated reason for the Probation Requirement, the Repeat Requirement and the Program Termination—her inadequate performance—could rationally be unworthy of credence. Nor has she shown under the second prong record evidence that would support a finding that retaliation "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. On that point, Plaintiff has not presented evidence

that UPMC previously retaliated against her or others,[138] nor has she shown that it treated more favorably similarly situated employees who did not complain about alleged discrimination. *See Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 765 (W.D. Pa. 2016) (citing *Simpson*, 142 F.3d at 644–45).

Because Plaintiff cannot demonstrate pretext under either prong of *Fuentes*, her retaliation claim fails as a matter of law, and summary judgment will be entered in favor of UPMC.

## C. Hostile Work Environment Claim

In opposing summary judgment, Plaintiff states that Defendants "have made no argument whatsoever to support dismissal of the hostile work environment claims." (ECF No. 161 at 14, n.2.) Defendants reply that Plaintiff pled no allegations in the Fourth Amended Complaint to support a hostile work environment theory that would survive *Iqbal*, she failed to exhaust her administrative remedies as to such a claim, and she cannot demonstrate the existence of severe or pervasive discrimination that altered the conditions of her employment based on the record evidence.[139]

A plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). "To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5)

---

[138] *See* Part III.A.3 *supra.*

[139] Defendants addressed this issue in their reply brief (ECF No. 171). But Plaintiff was permitted to file a sur-reply (ECF No. 180), so it is appropriate to consider the arguments advanced by the parties on this issue.

the existence of respondeat superior liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted).

Defendants are correct that Plaintiff failed to allege facts in the Fourth Amended Complaint to satisfy the necessary elements of a hostile work environment claim. She has not alleged that she suffered severe or pervasive discrimination that detrimentally affected her or would detrimentally affect a reasonable person in similar circumstances. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 88 n.12 (3d Cir. 2017) ("The District Court rightly dismissed [plaintiff's claim for hostile work environment based on sex (pregnancy and maternity leave)], noting that [plaintiff] did not allege this claim in her Complaint and may not belatedly do so now."). In short, such a claim is simply not in the case. Accordingly, summary judgment will be entered in favor of Defendants on Plaintiff's purported hostile work environment claim.

## D. Aiding and Abetting Discrimination Claim Against Individual Defendants

The PHRA provides that it is unlawful for any person or employer "to aid, abet, incite, compel or coerce" unlawful employment discrimination. 43 P.S. § 955(e). Individual "aiding and abetting liability" under the PHRA is limited to supervisors only. *See Dici v. Pennsylvania*, 91 F.3d 542, 552–53 (3d Cir. 1996). The Court agrees with Plaintiff that the Individual Defendants are proper defendants under the PHRA. *See id.* However, since the Court also concludes that Plaintiff's discrimination and retaliation claims against UPMC fail, there was no discrimination or retaliation for the Individual Defendants to aid and abet. *See Ramirez v. Palmer Twp.*, 292 F. Supp. 3d 609, 629 (E.D. Pa. 2018) ("One cannot aid and abet that which is not illegal in the first place.").

# IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 136) will

be granted. An appropriate Order follows.

Mark R. Hornak
Chief United States District Judge

cc:     All counsel of record

Date: April 10, 2019